<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JANICE MCCARTHY,<br><br>    Plaintiff,<br><br>    v.<br><br>MUSCLEPHARM CORPORATION, RYAN DREXLER, and SABINA RIZVI,<br><br>    Defendants. | Civil Action No. 22cv3412 (EP) (CLW)<br><br>**OPINION** |

**PADIN**, **District Judge.**

Plaintiff Janice McCarthy accuses her former employer, Defendant Musclepharm Corporation ("MP"), and MP executives Ryan Drexler and Sabina Rizvi, of violating New Jersey's Conscientious Employees Protection Act ("CEPA") and fraudulently inducing her to leave her prior job. Defendants move to dismiss or, in the alternative, to transfer the action to the District of Nevada. For the reasons below, the Court will **GRANT** the motion and dismiss the Complaint without prejudice.

**I.    BACKGROUND**[1]

    **A.    The parties**

Plaintiff is a New Jersey resident. D.E. 1 ("Compl.") ¶ 1. MP is a Nevada corporation headquartered in Las Vegas, Nevada which does business in New Jersey. ¶ 2. MP sells, among

---

[1] These facts are drawn from the Complaint's well-pled factual allegations, which are presumed for the purposes of this motion to be true.

other things, Combat Protein Powder and Combat Energy Drink. Drexler, MP's CEO, is a Nevada resident. ¶ 3. Rizvi, MP's president, is a Texas resident. ¶ 4.[2]

### B. MP hires Plaintiff

In August 2021, Defendants recruited Plaintiff to become MP's Vice President of Sales. ¶ 6. At the time, Plaintiff had been working as the Senior Digital Director of E-commerce for Revlon in New Jersey. ¶ 6. Drexler and Rizvi interviewed Plaintiff remotely. ¶¶ 7-8. During the interview process, Drexler and Rizvi assured Plaintiff that MP "was doing well financially," was collaborative, intended to hire other executives, and would empower her to staff her own sales team. ¶ 9. Relying on these representations, Plaintiff accepted MP's job offer. ¶ 11. By doing so, Plaintiff forwent an annual and retention bonus from Revlon. ¶¶ 12-13.

Plaintiff worked for MP from her New Jersey home and never traveled to Nevada for work. ¶¶ 14-16. Plaintiff learned that MP's condition was not as promised: MP was in an "extremely precarious" financial position, "operated as an autocracy," had not begun to interview a Vice President of marketing, was sourcing sales employees without her knowledge, had experienced extensive employee turnover in the six months before hiring her, was seeking a $7 million investment to fund raw materials and production to deliver enough revenue to have MP listed on the NASDAQ exchange, had delayed payments to its co-manufacturers, and had failed to purchase raw materials. ¶ 17.

### C. Plaintiff objects to MP's business practices

In Q2 2021, MP sought to increase its prices. ¶ 19. Costco, MP's largest customer, refused to accept the increase. ¶ 20. Without advising either Plaintiff or Costco, Drexler advised MP's

---

[2] Plaintiff seeks at least $94,500 comprising annual and retention bonuses from her former employer which she allegedly lost by accepting MP's employment offer. Based on complete diversity and the amount in controversy, the Court is satisfied that it has diversity jurisdiction.

co-manufacturer to substitute the protein powder in Combat Protein Powder with a cheaper instantized protein to improve MP's gross margin. ¶¶ 21-23. Plaintiff only learned of the change after Costco notified her of the "extensive number of returns and negative reviews from its consumers." ¶ 25. The negative reviews stemmed from the change in formulation's impact on "taste, mixability, and/or consistency." ¶ 26. There also appeared to be an issue with the sealing of individual Combat Protein Powder bags. ¶ 27. Costco demanded that MP take back all impacted products at is own expense, about $1 million. ¶ 28.

Costco also demanded an explanation. ¶ 29. When Plaintiff pressed Drexler and Rizvi, they discouraged her from revealing the product reformulation, even after Costco accused MP of cutting corners at customer expense. ¶ 32.

Because of the $1 million Costco-related liability, Defendants faced pressure to deliver a guaranteed $2 million gross margin in November 2021 to meet its commitment to investors. ¶ 33. Defendants therefore reformulated Combat Protein Powder using cheaper ingredients, including replacing Micellar Casein with Milk Protein Concentrate. ¶ 34.

When Costco asked why, Drexler explained that the substitution was for taste and mixability. ¶ 35. To further convince Costco, Drexler also instructed an MP employee to initiate a market-wide survey to validate that customers had taste-tested the new product. ¶ 36. But in actuality, the survey consisted of five individuals solicited in a gym by Drexler's friend, who also served as an informal MP brand ambassador. ¶ 37. When Plaintiff learned about the survey, she expressed to Drexler and Rizvi that MP should not share its results with Costco. ¶ 38. Rizvi agreed. ¶ 39.

Plaintiff also recommended that MP confirm whether substituting Micellar Casein with Milk Protein Concentrate implicated regulatory requirements to obtain a new Universal Product

Code ("UPC"). ¶ 40. Drexler dismissed Plaintiff's concerns. ¶ 41. Rizvi "conducted informal research" and concluded that MP did not need to obtain a new UPC. ¶ 42.

Costco returned the approximately $1 million of Combat Protein Powder. ¶ 43. But instead of replacing the entire shipment, Drexler instructed MP's co-manufacturer to send back to Costco any product that did not appear to have any bag sealing issues, enabling cost-saving. ¶ 44. Thus, at least $100,000 of Combat Protein Powder that Costco had just returned to MP was sent back to Costco without informing Costco that it was receiving the same product it had already rejected. *Id.* When Plaintiff questioned that decision, Drexler blamed MP's former Vice President of Supply Chain, who had recently resigned. ¶ 45. But when Plaintiff spoke to the co-manufacturer's President, he identified Drexler as the person who approved sending the same Combat Protein Powder back. ¶ 46.

On November 5, 2021, Drexler instructed Plaintiff to place two orders of the newly formulated Combat Protein Powder for Amazon, one of which exceeded $800,000. ¶ 47. Plaintiff objected, arguing that the orders constituted approximately a full year of sales. ¶ 48. And because MP's Amazon agreement required MP to purchase any product not sold within 90 days, any purported revenue would be canceled out by the required buyback. ¶ 49. Nevertheless, Drexler insisted on the purchase "because MP desperately needed additional sales…to be able to show investors more than $800,000 in additional purported revenue in November 2021." ¶¶ 50-51.

D.   **Plaintiff objects to MP's channel stuffing**

Plaintiff objected to MP's plan to outsource storage facilities for several customers to house a new product, Combat Energy, so those customers could place much larger initial orders than they could store at their own facilities. ¶ 52. When Plaintiff argued that it would be improper for MP to treat those products as having been sold if they were in MP-controlled facilities, Drexler told

4

her to "do what it takes to secure those sales." ¶ 53. When Plaintiff asked MP's comptroller, he expressed that "it would be improper to treat [the products] as having been sold or to record the revenue." ¶ 54. When Plaintiff relayed that to Drexler, Drexler "suggested having the customer sign a contract with the storage facility to enable MP to pay for the facility and for the customer to place the orders." ¶ 55. When Plaintiff reiterated her objection, Drexler "became belligerent…and reprimanded her[.]" ¶¶ 57-58. Another employee ultimately followed Drexler's orders.

E.   **Defendants allegedly retaliate**

Plaintiff, Rizvi, and Drexler had a call on November 18, 2021. ¶ 60. Drexler "inflated the fact that [Plaintiff] had not copied him,[3] or celebrity spokesperson TJ Dillashaw, on an email to Costco's buyers about MP Combat Energy Drink." ¶ 61. Drexler had guaranteed the Energy Drink's creators $5 million in sales by December 31, 2021, but had not committed any marketing resources or media investment. ¶ 62. But according to Plaintiff, Drexler's continued "belligerence" stemmed from Plaintiff's objections to MP's business practices. ¶¶ 64-65. Plaintiff resigned. ¶ 66.

On December 20, 2021, Plaintiff's attorney sent Drexler and Rizvi a letter outlining her retaliation claim. ¶ 67. One day after settlement negotiations ended unsuccessfully, MP filed an action in the District of Nevada against Plaintiff and two other employees. ¶¶ 68-69 (citing D.N.V. No. 3:22-cv-00170 (the "Nevada Action")).[4]

---

[3] Plaintiff copied Rizvi, not understanding that Drexler intended Mr. Dillashaw, a former UFC fighter who had not worked with the Costco buyer, to be the primary contact. ¶ 63.
[4] After Plaintiff moved in the Nevada action to dismiss for lack of personal jurisdiction, MP voluntarily dismissed that action without prejudice. D.E. 11.

### F. This action and motion

Plaintiff filed this action in New Jersey Superior Court, Bergen County. Defendant removed the action to this Court. D.E. 1. The Complaint asserts two counts: violation of CEPA (Count I) and Fraud in the Inducement (Count II). D.E. 1 at 7. Defendants move to dismiss both, or in the alternative to transfer the action to the District of Nevada. D.E. 7 ("Mot."). Plaintiff opposes. D.E. 8 ("Opp'n"). Defendants have replied. D.E. 9 ("Reply").

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) does not require that a complaint contain detailed factual allegations. However, the allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Twombly*, 550 U.S. at 570; *see also West Run Student Hous. Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 169 (3d Cir. 2013). That standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Id.*

Rule 12(b)(6) provides for the dismissal of a complaint if it fails to state a claim upon which relief can be granted. As the moving party, the defendant bears the burden of showing that no claim has been stated. *Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n.9 (3d Cir. 2011). For the purposes of the motion, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *New Jersey Carpenters & the Trustees Thereof v. Tishman Const. Corp. of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014).

### III. DISCUSSION

#### A. Plaintiff's CEPA claim (Count I) will be dismissed

##### 1. CEPA claims generally

The New Jersey legislature enacted CEPA to "protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct." *Abbamont v. Piscataway Township Bd. of Educ.,* 138 N.J. 405, 431 (1994). The statute provides in relevant part:

> An employer shall not take any retaliatory action against an employee because the employee does any of the following:
> ...
> c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
>
> > (1) is in violation of a law, or a rule or regulation promulgated pursuant to law ...;
> > (2) is fraudulent or criminal; or
> > (3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

N.J.S.A. 34:19–3.

To establish a prima facie CEPA violation, "it is not enough" that an employee simply "blow the whistle" on conduct with which he disagrees. *Carmona v. Restorts Int'l Hotel, Inc.*, 189 N.J. 354, 371 (2007). The employee must demonstrate that: (1) an objection to, or refusal to participate in an activity, policy or practice which the employee reasonably believed violated either a law, rule, regulation, was fraudulent or criminal or violated a public policy; (2) a "whistle blowing" activity as described in N.J.S.A. § 34:19-3(c); (3) an adverse employment action; and (4) a causal connection between the whistle-blowing activity and the adverse employment action. *Wheeler v. Twp. of Edison*, 326 Fed. App'x. 118, 123 (3d Cir. 2009).

*2. Plaintiff has adequately pled that she reasonably believed Defendants engaged in fraud*

A CEPA plaintiff "need not show that his or her employer or another employee *actually violated* the law or a clear mandate of public policy." *Dzwonar v. McDevitt*, 177 N.J. 451, 462 (2003) (emphasis added) (citing *Estate of Roach v. TRW, Inc.*, 164 N.J. 598, 613 (2000) (holding that section 3c(1) of CEPA "does not require that the activity complained of ... be an actual violation of a law or regulation")). "Instead, the plaintiff simply must show that he or she 'reasonably believes' that to be the case." *Id.*

But even though a plaintiff need not prove an actual violation, the plaintiff must nevertheless identify a "statute, regulation, rule, or public policy" that the plaintiff reasonably believed the defendant violated. *Id.* at 463. Dismissal is appropriate "when no such law or policy is forthcoming." *Id.* at 463, 469 (holding that trial court should have precluded CEPA claim premised on violation of union bylaws).

Here, Plaintiff alleges only that she "objected to and/or refused to participate in multiple activities she reasonably believed constituted fraud, violated the law, regulations promulgated pursuant to law, a clear mandate of public policy, and/or is otherwise protected from retaliation by CEPA." Compl. ¶ 76. The only specific, identifiable "statute, regulation, rule, or public policy" apparent from the Complaint is fraud. "To plead a CEPA claim predicated on fraud, however, a plaintiff must meet the particularity requirements of Federal Rule of Civil Procedure 9(b)." *Munenzon v. Peters Advisors, LLC*, 553 F. Supp. 3d 187, 203 (D.N.J. 2021); *Safonof v. DirectSat USA*, No. 19-07523, 2020 WL 1527946, at *4 (D.N.J. Mar. 31, 2020) (applying Rule 9(b) to fraud-based CEPA claim).

Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). *See U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*,

812 F.3d 294, 307 (3d Cir. 2016) ("A plaintiff alleging fraud must therefore support its allegations 'with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue.'"). To the extent that Plaintiff argues that there is no such requirement, relying upon *Battaglia v. United Parcel Serv., Inc.*, 214 N.J. 518, 557 (2013), *Battaglia* does not address federal pleading standards. *See also Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (applying Rule 9(b) standard to claim for fraud under New Jersey law). Though Plaintiff may disagree with the requirement, she has nevertheless met its standards here. As Plaintiff argues, the Complaint pleads with specificity her objections to five instances which she reasonably believed to be fraud: (1) Defendants concealing from Costco that MP had reformulated Combat Protein Powder using cheaper ingredients; (2) Defendants concealing from Costco that they sent back returned bags of Combat Protein; (3) Defendants' misleading "taste test"; (4) Defendants' plan to place $800,000 worth of sales to artificially increase revenues and mislead investors; and (5) the "channel stuffing." Opp'n 10. Accordingly, Plaintiff has pled with sufficient specificity that she reasonably believed that Defendants were engaging in fraud.

> 3. *Plaintiff has not adequately pled an adverse employment action or whistleblowing activity*

A CEPA plaintiff must also plead whistle-blowing activity, an adverse employment action, and a causal connection between the two. It is unclear what activity Plaintiff pleads here, as "[m]erely questioning or disagreeing with an employer's policies or practices does not constitute 'whistle-blowing' activity within CEPA's meaning." *Gimello v. Costco Wholesale Corp.*, No. A-1506-07T3, 2008 WL 5115884, at *4 (N.J. Super. Ct. App. Div. Dec. 8, 2008) (unpublished) (citing *Blackburn v. U.S. Postal Service, Inc.*, 3 F.Supp.2d 504, 517 (D.N.J.1998), *aff'd,* 179 F.3d 81 (1999)).

Nor do Plaintiff's hostile work environment and wrongful termination allegations adequately plead an adverse employment action. These allegations are related, *i.e.* the hostile work environment constituted a constructive discharge. Specifically, the hostility alleged is that, in response to Plaintiff's objection to MP's "channel stuffing" plan, Drexler became belligerent, reprimanded her, began finding excuses to criticize her, and otherwise made it clear he was angry at her for not following his instructions. Opp'n 11 (citing Compl. ¶¶ 58, 60-64).[5] Drexler's "frequent belligerence and anger," Plaintiff argues, "made it abundantly clear that her objections to Defendants' fraudulent and illegal activities were falling on deaf ears, and Defendants were going to continue to instruct her to engage in similar practices and berate her if and when she refused to do so." *Id.* (citing Compl. ¶ 65).

In determining whether an actionable hostile work environment claim exists, courts look to "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Green v. Jersey City Bd. of Educ.*, 177 N.J. 434, 447 (2003). For example, an adverse employment action can occur when an employer targets an employee for reprisals – "making false accusations of misconduct, giving negative performance reviews, issuing an unwarranted suspension, and requiring pretextual mental-health evaluations – causing the employee to suffer a mental breakdown and rendering him unfit for continued employment." *Donelson v. DuPont Chambers Works*, 206 N.J. 243, 258 (2011); *see also Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) (A tangible employment action is "a significant change in employment status, such as hiring, firing, failing to

---

[5] To the extent that the Complaint limits those allegations to Drexler, that is sufficient to dismiss the CEPA claim against Rizvi, who is not alleged to have engaged in that conduct.

promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.").

But that is not what is alleged here. Instead, Plaintiff broadly alleges yelling, belligerence, and reprimands which preceded Plaintiff quitting upon her assumption that the conduct would continue. Those actions, however, do not constitute a hostile work environment or constructive discharge. *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1298 (3d Cir. 1997) (employer's unjustifiable, harsh reprimand in front of others, "continuously bother[ing]" at work, persistent non-work-related calls, and negative comments, even considered together, were not an adverse employment action because "[f]ormal reprimands that result in a notation in an employee's personnel file could be sufficiently concrete, but harsh words that lack real consequences are not."), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006); *McKee v. Hart,* 436 F.3d 165, 170 (3d Cir. 2006) (holding admonishments, deemed 'harassment' by plaintiff, were not sufficient to constitute retaliation in the First Amendment context, in which the same standard applies); *Sell It Soc., LLC v. Strauss*, No. 15 CIV. 970, 2018 WL 2357261, at *13 (S.D.N.Y. Mar. 8, 2018) (yelling "is not an actionable adverse employment action under the CEPA").

Accordingly, Plaintiff's CEPA claim will be dismissed. However, because of the liberal pleading standard and principle that "the purpose of pleading is to facilitate a proper decision on the merits," Plaintiff will be granted leave to amend. *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (cleaned up); *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002).

### B. Plaintiff's Fraud in the Inducement (Count II) claim will be dismissed

Defendants also seek to dismiss Plaintiff's fraud in the inducement claim, which alleges that Drexler and Rizvi made false statements to Plaintiff to induce her to leave Revlon and forego

11

bonuses. Mot. 11. Fraudulent inducement claims require: (1) a material representation of a presently existing or past fact; (2) made with knowledge of its falsity; and (3) with the intention that the other party rely thereon; (4) resulting in reliance by that party; (5) to that party's detriment. *Torsiello v. Strobeck*, 955 F. Supp. 2d 300, 309 (D.N.J. 2013). Such claims must be pled with sufficient particularity to put each defendant on notice of the alleged fraudulent conduct. *Frederico,* 507 F.3d at 200. Plaintiffs may satisfy this requirement by pleading the "date, place or time" of the fraud, or through "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Lum v. Bank of America*, 361 F.3d 217 (3d Cir. 2004), *abrogation on other grounds recognized by In re Insurance Brokerage Antitrust Litig.*, 618 F.3d 300, 323 n.22 (3d Cir. 2010).

The Complaint fails to satisfy these pleading standards for multiple reasons. The first is vagueness: the Complaint does not specifically identify whether it was Rezvi or Drexler who allegedly misrepresented anything about MP. This is group pleading, inadvisable in any context but impermissible under the heightened fraud-pleading standards. *Klein v. Gen. Nutrition Cos.*, 186 F.3d 338, 345 (3d Cir. 1999) ("Fed. R. Civ. P. 9(b) requires, at a minimum, that the plaintiff identify the speaker of allegedly fraudulent statements."); *see also Falat v. Cty. of Hunterdon*, No. 12-6804, 2013 U.S. Dist. LEXIS 37398, at *11 (D.N.J. Mar. 19, 2013) ("Without knowing exactly what wrongful conduct they are alleged to have engaged in, the individuals Defendants have not been given fair notice of the allegations against them."). Similarly, Plaintiff does not identify precisely when the statements were made. *Frederico*, 507 F.3d at 200 (affirming dismissal where plaintiff "fail[ed] to allege *when* she attempted to return the truck to Home Depot and whether this attempted return was prior to the time it was due at 7:38 pm or even before the store closed at 10:00 pm.") (emphasis in original), *abrogated on other grounds by statute as recognized in Young*

*v. Bloomingdale's Short Hills*, No. 2:21-10764, 2021 U.S. Dist. LEXIS 174178, at *5 (D.N.J. Sep. 14, 2021).

Additionally, the statements which the Complaint alleges to be fraudulent are not actionable. Those statements were that MP: (1) was doing well financially; (2) operated collaboratively; (3) was in the process of hiring VPs of marketing and supply chain and an outside marketing agency; and (4) Plaintiff would be able to staff her own sales team. These all fall into two, non-actionable categories. The first category (the first two statements, though there is some overlap) is "puffery" or "vague and ill-defined opinions," which is not misrepresentation and therefore not an actionable assurance of fact. *Diaz v. Johnson Matthey, Inc.*, 869 F. Supp. 1155, 1165 (D.N.J. 1994); *see also VT Investors v. R&D Funding Corp.*, 733 F. Supp. 823, 838 (D.N.J. 1990) (statements that company in which plaintiffs invested would soon generate positive cash flow in excess of $ 60,000 per month "puffery" because it was an emphatic statement of opinion); *Phillips v. Ford Motor Co.*, No. 00-60312, 2000 U.S. App. LEXIS 39161, at *3 (5th Cir. Nov. 21, 2000) (unpublished) (statement representing that dealership was "successful and would continue to be" was nonactionable).

And the second category (MP's third and fourth alleged statements) is the prediction of future events, likewise non-actionable. *Chatlos Systems, Inc. v. National Cash Register Corp.*, 479 F. Supp. 738, 748-49 (D.N.J. 1979); *rev'd in part on other grounds*, 635 F.2d 1081 (3d Cir. 1980); *Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 435 (D.N.J. 1997) (statements that "relationship would be long lasting," "agreement one in perpetuity", "…part of future plans," "…into the twenty-first century and beyond" were all non-actionable); *Bowman v. Honeywell Int'l., Inc.*, 438 F. App'x 613, 615 (9th Cir. 2011) (purported misrepresentation that plaintiff would

start work in the future if she passed a background check was non-actionable). Accordingly, Plaintiff's Count II will also be dismissed without prejudice.

### C. Transfer to Nevada

Because the Court has determined that dismissal is appropriate, the branch of Defendants' motion seeking to transfer the matter to Nevada is now moot.

### IV. CONCLUSION

For the reasons above, the Court will **GRANT** Defendants' motion to dismiss and **DISMISS** Plaintiff's Complaint without prejudice.[6]  Plaintiff may, within 30 days, file a proposed amended complaint, without the necessity of a formal motion to amend.  If no amended complaint is submitted, this dismissal will become a dismissal with prejudice.  An appropriate order follows.

Dated: January 23, 2023

Evelyn Padin, U.S.D.J.

---

[6] While this motion was pending, Plaintiff voluntarily dismissed MP only pursuant to Rule 41. D.E. 12. Even if MP had not been dismissed, the analysis above would nevertheless apply.